UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| J. TAYLOR & ASSOCIATES, LLC, § § § Plaintiff, § § v. § § Civil Action No. 4:21-cv-00101-P § MATTHEW SPANGLER AND VMG § HEALTH, LLC, § § Defendants. § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT
AND APPLICATION FOR INJUNCTIVE RELIEF**

Plaintiff J. Taylor & Associates, LLC ("Plaintiff" or "JTaylor") files its First Amended Complaint and Application for Injunctive Relief against Matthew Spangler and VMG Health, LLC (collectively "Defendants"), and respectfully shows the Court the following:

### I.   PARTIES

1. Plaintiff J. Taylor & Associates, LLC ("JTaylor") is a limited liability company organized under the laws of the State of Texas. JTaylor is therefore a citizen of Texas

2. Defendant Matthew Spangler, is an individual currently residing in Denver, Colorado. Spangler has already appeared in this case.

3. Defendant VMG Health, LLC is a Texas Limited Liability Company with its principal place of business in Texas. VMG can with process by serving its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 7520.  Upon information and belief, VMG is a citizen of Texas.

## II. JURISDICTION AND VENUE

4. This court does not have jurisdiction over this civil action because there is not complete diversity of jurisdiction between JTaylor and Defendants. JTaylor has filed a motion to remand to State District Court due to this jurisdictional defect.

5. This Court has personal jurisdiction over Defendants because Defendants performed acts that constitute doing business in Texas by making a contract in Texas that was performable in whole or in part in Texas, committing a tort in whole or in part in Texas, and/or otherwise purposefully availing themselves of the benefits and protections of Texas law.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the Northern District of Texas.

## III. FACTUAL BACKGROUND

### JTaylor is a Leader in the Healthcare Financial Consulting Field

7. JTaylor is a full-service CPA firm that provides accounting, tax, assurance, and consulting services for clients not only in Texas, but also across the entire country. Of particular importance is the healthcare consulting division of JTaylor, which provides an array of financial consulting and business valuation services to its clients in the healthcare field, including "black box" consulting services for institutional healthcare clients. Over the course of twenty-plus years, JTaylor has separated itself from a crowd of competitors as a result of its unique approach to healthcare valuation and consulting.

8. That distinction can be largely credited to JTaylor's development of voluminous databases of data and research, and unique formulas, processes, and analysis that are not known by its competitors. In particular to this dispute, the processes, formulas, and analysis approaches used by JTaylor for its "black box" work were developed over many years as a result of a

significant investment in data, analysis, and research. That knowledge is key to Plaintiff's ability to source, land, and retain clients in the healthcare industry. In addition, JTaylor has engaged in significant marketing of its services and developed long-standing relationships at key positions within a number of institutional healthcare clients. Each of the foregoing are considered "Confidential Information" of JTaylor. Through JTaylor's development and use of the Confidential Information, it has amassed a diverse and sophisticated client base of institutional healthcare clients, such as large physician practices, hospitals, and health systems. Due to the substantial time and effort that JTaylor has expended developing its Confidential Information, goodwill, and extensive client base, JTaylor has put in place restrictive covenants to prohibit employees from using the Confidential Information they receive while employed to take JTaylor clients, or direct them to other firms, after their departure.

9. In addition, all of the aforementioned Confidential Information is considered highly confidential and trade secrets of Plaintiff. JTaylor's unique knowledge and know-how are its stock-in-trade and constitute trade secrets under the Texas Uniform Trade Secrets Act. Plaintiff goes to great lengths to maintain the confidentiality and trade secret status of such information. Among other things, JTaylor protects such information through the use of passwords, encrypted software, and robust confidentiality agreements.

**Spangler is Hired in JTaylor's Healthcare Consulting Division**

10. In the summer of 2015, Spangler sought employment at JTaylor within the healthcare consulting division of the company. After going through an extensive interview process, JTaylor extended an offer to Spangler for employment. Given the nature of the position offered, and the Confidential Information that would be disclosed to Spangler in that role, the offer was contingent upon Spangler's agreement to abide by JTaylor's confidentiality agreements, described below. Simply put, maintaining the confidentiality of JTaylor's information was critical to its

decision to employ Spangler. Accordingly, on Spangler's first day of work, Spangler was required to sign a Confidentiality Agreement in connection with his employment at JTaylor, and he subsequently signed amendments to that Confidentiality Agreement.[1]

11. Likewise, on Spangler's first day at JTaylor, and as a condition of his receipt of any JTaylor Confidential Information, he signed an agreement with JTaylor that provided significant financial incentives for new business and new employees recruited by Spangler.[2] Spangler subsequently signed amended versions of that agreement in 2016 and 2017. The most recent 2017 agreement is hereinafter referred to as the "Level II Compensation Agreement."[3]

12. Importantly, the Level II Compensation Agreement includes confidentiality provisions, as well as restrictive covenants (the "Restrictive Covenants"). The Restrictive Covenants prohibit, among other things, the following during the two-year period after termination of Spangler's employment:

- providing services to those persons or entities who were clients of JTaylor as of Spangler's termination date or for the one-year period immediately preceding his termination date;[4]

- interfering with the relationship between JTaylor and any of its clients; and

---

[1] JTaylor updated its confidentiality policy in April of 2018, providing additional and further description of the "Confidential Information" of JTaylor and emphasizing that all JTaylor "employees are to maintain Confidential Information in the strictest confidence and may not disclose, use or publish any Confidential Information except as may be required in connection with their work for the Firm. . ." Spangler was required to acknowledge and agree to such policy as a condition of his continued employment at JTaylor. This, along with the confidentiality agreement signed by Spangler in 2015 are collectively referred to hereinafter as the Confidentiality Agreements.

[2] JTaylor provided Spangler with significant resources for business development in relation to the Level II Compensation Agreement.

[3] The Level II Compensation Agreement also includes an acknowledgement from Spangler that in exchange for a new (favorable) compensation structure, he would be provided access to, and would continue to receive access to, Confidential Information of JTaylor. Spangler agreed to refrain from disclosing the Confidential Information outside of his employment duties to JTaylor.

[4] This provision is limited to the clients in which Spangler (a) had personal contact or dealings on behalf of JTaylor; (b) had knowledge of JTaylor's plans with respect to such client; (c) had knowledge not available to the general public regarding such client's business operations, financial affairs, business strategies or other unique aspects; or (d) had direct or indirect responsibility for providing services to the client.

- soliciting or seeking to influence any employee of JTaylor to leave the employment of JTaylor or to become the employee or contractor of any other person or entity engaged in business that is competitive with JTaylor.

13. Consistent with the confidentiality provisions in the Confidentiality Agreements and the Level II Compensation Agreement, JTaylor provided Spangler with Confidential Information throughout his employment. In particular, as it related to the "black box" work that Spangler was performing, JTaylor provided him with specific training regarding JTaylor's databases of data and research, and unique formulas, processes, and analysis.

*VMG Attempts to Acquire JTaylor*

14. Generally speaking, VMG is a competitor of JTaylor in the healthcare financial consulting market. However, historically, VMG has not had a significant presence in the "black box" subcategory of healthcare consulting relative to its other lines of business. JTaylor's knowledge, experience, and client base in the healthcare consulting field – and in particular its "black box" work – makes it an attractive target for other CPA and consulting firms. As such, in January 2019, VMG approached JTaylor about a potential acquisition. VMG's key area of interest was JTaylor's healthcare consulting division, including the "black box" work that JTaylor was doing – work that is both highly lucrative and involves exclusive clientele.

15. VMG and JTaylor continued discussions regarding a potential acquisition through May of 2019. However, in May of 2019, JTaylor informed VMG that it did not have interest in completing a transaction. VMG reached out again in April of 2020 in attempt to rekindle the acquisition discussions, but JTaylor again relayed that it had no interest in an acquisition.

16. Now that VMG had no hope in acquiring JTaylor, it had an incentive to hire JTaylor employees, particularly for VMG's "black box" division that it was actively attempting to grow.

***Defendant Accepts New Employment with a Competitor and Violates His Restrictive Covenants***

17. In June of 2020, less than two months after JTaylor most recently relayed to VMG its lack of interest in being acquired, Spangler notified JTaylor that he was accepting new employment with VMG. JTaylor had concerns about this new employment arrangement, given that VMG was a direct competitor that serviced many of the same clients as JTaylor, but nonetheless trusted that Spangler would abide by his Confidentiality Agreements and the Restrictive Covenants.

18. Unfortunately, that trust was misplaced. Before Spangler finished packing his office, he began a campaign of surreptitiously (1) contacting JTaylor clients in an attempt to solicit business to VMG in violation of the Restrictive Covenants; (2) soliciting JTaylor employees to join him at VMG in violation of the Restrictive Covenants; and (3) attempting to use JTaylor's Confidential Information in furtherance of his new employment at VMG despite direction to the contrary. On information and belief, VMG was assisting and encouraging Spangler in his scheme. As soon as JTaylor discovered the offending conduct, it sent a demand letter to Spangler reminding him of the Restrictive Covenants and Confidentiality Agreements and demanding that he immediately cease and desist such wrongful and illegal conduct. JTaylor further notified Spangler that a lawsuit would be filed unless he signed a written statement affirming his Restrictive Covenants and Confidentiality Agreements and affirming that no further improper conduct would occur. JTaylor copied VMG on the correspondence to ensure that VMG was aware of the Restrictive Covenants and Confidentiality Agreements.

***Spangler Signs a Written Statement that he will Abide by his Agreements***

19. Spangler and VMG quickly responded to the demand, assuring that all had been a misunderstanding and that Spangler had no intention of violating the Restrictive Covenants and

Confidentiality Agreements. Spangler then provided a written statement affirming his Restrictive Covenants and attesting to his continued compliance with same:

> **"I acknowledge and agree to comply with the Level II agreement that I signed in 2016. To my knowledge, I have not, <u>nor do I intend to, break any of the covenants set forth in that agreement</u>. Additionally, I have not, <u>nor do I intend to, solicit JTaylor employees or clients</u>. Finally, I am not, and do not plan to be, in possession of any JTaylor documents, materials, or other property."** (emphasis added)

20. Counsel for VMG reached out via email and likewise confirmed that VMG would respect Spangler's agreements with JTaylor:

> **I wanted to ensure you were aware that Mr. Spangler's employment with VMG is conditioned on: (1) his compliance with the post-employment restrictions in his JTaylor Level II Compensation Agreement; and (2) his confirmation that he does not possess any non-public electronic or paper documents, files, or data belonging to JTaylor or its clients. Mr. Spangler has agreed to fulfill #1 and has confirmed #2 to VMG. (emphasis added)**

21. Based on the assurances of Spangler and counsel for VMG, JTaylor refrained from taking any further legal action at that time.

### Spangler Violates His Restrictive Covenants <u>a Second Time</u>, and Misappropriates Plaintiff's Confidential Information and Trade Secrets in Violation of his Agreements and Texas Law

22. As mentioned, JTaylor has developed a sophisticated and diverse group of clients over the course of the past twenty years, and it protects its investment in those clients through, among other things, the Restrictive Covenants that were signed by Spangler. JTaylor recently discovered that Spangler is brazenly attempting to steal those clients in violation of his Restrictive Covenants and that VMG has participated in that effort. Specifically, JTaylor received information from one of its large health system clients (CHRISTUS Health) that Spangler had provided "black box" services to CHRISTUS in the past three months (in violation of the Restrictive Covenants). In addition, Spangler also used JTaylor Confidential Information in the course of those services. To make matters worse, CHRISTUS was a client that Spangler had provided "black box" services for while at JTaylor and about whom Spangler had received significant Confidential Information

in furtherance of those services. Spangler's actions are an egregious violation of both his Restrictive Covenants and the Confidentiality Agreements he signed while at JTaylor. VMG has benefited from those violations by receiving revenues from the ill-gotten work.

23. JTaylor suspected that VMG was behind Spangler's attempt to steal clients he served while an employee of JTaylor. Nonetheless, in abundance of caution, JTaylor reached out to the CEO of VMG to discuss. The call with the CEO was revealing. On that call the CEO **did not** claim ignorance of Spangler's misconduct, **did not** attempt to excuse or explain-away the conduct, and most important, **did not** give any indication that VMG would attempt to keep Spangler from further violating his Restrictive Covenants. Instead, he chose to criticize JTaylor for filing a lawsuit, noting that "it is a small world." Even worse, in a show of complete disregard for JTaylor's Restrictive Covenants, the CEO commented that JTaylor was going to have to learn what was and was not an enforceable restrictive covenant. VMG showed its true colors. It was not only involved in Spangler's wrongful conduct, it was willing to spend time and money fighting a losing battle to avoid owning up to its wrongdoing.

24. Since then, JTaylor has further confirmed that Spangler's work for CHRISTUS was not an accident that he or VMG can avoid. JTaylor discovered that Spangler was the main point of day-to-day contact during the majority of the work effort for CHRISTUS and that the work product was largely generated by Spangler. Thus, it appeared that Spangler was managing the work performed. In short, Spangler's role on the project was more than mere low-level or tangential assistance, something that could have potentially slipped through without VMG's knowledge. VMG was well aware of Spangler's Confidentiality Agreements and Restrictive Covenants and had even promised to abide by them. But it nonetheless participated with Spangler's outright breaches of those agreements.

25. Given that this is Spangler's second confirmed violation of the Restrictive Covenants and Confidentiality Agreement in only a matter of months, JTaylor was left with no choice but to file this lawsuit to prevent further violations of its Restrictive Covenants and theft of its confidential information.

## IV.   CLAIMS

### Count One - Breach of Contract Against Spangler

26. Plaintiff incorporates the foregoing paragraphs by reference.

27. The Confidentiality Agreements and Level II Compensation Agreement (collectively the "Agreements") are valid, existing contracts between Plaintiff and Spangler.

28. Plaintiff has tendered performance under the Agreements.

29. Spangler has breached the Agreements by its actions described herein, including by violating the Restrictive Covenants, and by using Plaintiff's Confidential Information in the provision of services for CHRISTUS in violation of the Agreements' confidentiality provisions.

30. Spangler's conduct has proximately and foreseeably caused, and continues to cause, Plaintiff to suffer damages in excess of the jurisdictional limits of this Court, which Plaintiff seeks to recover.

31. Plaintiff further seeks an Order from the Court tolling the Restrictive Covenants during the period in which Spangler breached same.

### Count Two - Violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Chapter 134A ("TUTSA") Against Spangler and VMG

32. Plaintiff incorporates the foregoing paragraphs by reference.

33. Plaintiff's intellectual property – namely, expertise and knowledge with respect to business contacts, relationships, synergies, and data, research, analysis, formulas, and processes that Plaintiff developed over the course of years of experience in this business – constitutes a trade

secret under TUTSA. Further, as specifically related to JTaylor's "black box" work for clients, JTaylor's formulas, processes, and analysis are considered trade secret under TUTSA. Each of the foregoing comprise financial, business, and technical information, including methods, processes, and procedures.

34. Plaintiff has taken reasonable measures under the circumstances to keep this information secret, including password protection, encryption, and requiring that its employees sign robust confidentiality agreements. Plaintiff derives independent economic value from the fact that this information is not generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from it.

35. Defendants' actions, as described herein, constitute misappropriation trade secrets under TUTSA.

36. As a proximate and foreseeable result of Defendants' actions, Plaintiff has suffered, and continues to suffer, damages within the jurisdictional limits of this Court.

37. Defendants' misappropriation was willful and malicious. Therefore, Plaintiff seeks exemplary damages in an amount equal to twice Plaintiff's actual damages.

38. The Texas Uniform Trade Secrets Act further provides for injunctive relief to prevent "any actual or threatened misappropriation" described in such statute. JTaylor seeks injunctive relief as set forth below in accordance with such statute. Tex. Civ. Prac. & Rem. Code § 134A.003.

**Count Three - Common Law Trade Secret Misappropriation Against Spangler and VMG**

39. Plaintiff incorporates the foregoing paragraphs by reference.

40. Spangler had a confidential relationship with Plaintiff through the actions described herein.

41. The intellectual property which Plaintiff provided to Spangler during the course of their relationship – including but not limited to expertise and knowledge with respect to business contacts, markets, relationships, synergies, and other data, research, analysis, and information – is a trade secret owned by Plaintiff under Texas law. Likewise, as specifically related to JTaylor's "black box" work for clients, JTaylor provided to Spangler its formulas, approaches, processes, and analysis, which are considered trade secret under Texas law.

42. Plaintiff has taken reasonable measures under the circumstances to keep this information secret, including password protection, encryption, and requiring that its employees sign robust confidentiality agreements. Plaintiff derives independent economic value from the fact that this information is not generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from it.

43. Defendants breached this confidential relationship by unlawfully using Plaintiff's intellectual property as described herein.

44. As a proximate and foreseeable result of Defendant's' actions, Plaintiff has suffered, and continues to suffer, damages within the jurisdictional limits of this Court.

**Count Four - Tortious Interference with Contracts Against VMG**

45. Plaintiff incorporates the foregoing paragraphs by reference.

46. The Agreements were valid and binding contracts between JTaylor and Spangler, and VMG was aware of the Agreements.

47. As set forth above, VMG has, through improper motive and/or means, tortiously interfered with JTaylor's Agreements with Spangler.

48. As a result of VMG's wrongful actions, JTaylor has sustained damages and continues to sustain damages.

**Count Five - Unjust Enrichment Against Spangler and VMG**

49. Plaintiff incorporates the foregoing paragraphs by reference.

50. Through the actions described herein, including unlawfully using Plaintiff's intellectual property with respect to JTaylor's clients, Defendants have wrongfully received unconscionable benefits and been unjustly enriched.

51. Plaintiff seeks return and repayment of the benefits received by Defendants.

**Count Six - Conspiracy Against Spangler and VMG**

52. Plaintiff incorporates the foregoing paragraphs by reference.

53. Spangler and VMG conspired with each other to commit the foregoing torts. Together, they orchestrated a plan by which they would use JTaylor's Confidential Information and violate the Restrictive Covenants. This unlawful conduct was carried out for the purpose of using JTayor's Confidential Information and stealing JTaylor's clients, and thereby allowing Defendants to benefit from such unlawful gains.

54. Defendants' conduct caused harm to JTaylor for which it seeks recovery in this lawsuit. JTaylor is entitled to an award of actual damages, as well as exemplary damages because Defendants acted in bad faith and with malice.

**Count Seven - Punitive Damages**

55. Plaintiff incorporates the foregoing paragraphs by reference.

56. The wrongful conduct of Spangler and VMG, as described above, has been conducted willfully and with malice and/or was grossly negligent. Accordingly, JTaylor is entitled to recover from Defendants the maximum amount of exemplary damages permitted under Texas law.

**Count Eight - Attorneys' Fees**

57. Plaintiff incorporates the foregoing paragraphs by reference.

58.    As a result of the actions complained of herein, Plaintiff has been required to employ the law firm of Winstead PC to pursue the relief requested in this Original Petition and Application for Injunctive Relief. Plaintiff seeks recovery of all reasonable and necessary attorneys' fees, expenses, and court costs incurred in this action against Defendants in accordance with the attorneys' fees provision in the Level II Compensation Agreement and Chapters 38, and 134A of the Texas Civil Practice and Remedies Code. Additionally, Plaintiff seeks recovery of all prejudgment and post-judgment interest at the highest rate allowed by law.

***Preliminary and Permanent Injunction***

59.    Plaintiff incorporates the foregoing paragraphs by reference.

60.    Pursuant to Chapters 65 and 134A of the Texas Civil Practice and Remedies Code and the Federal Rules of Civil Procedure, Plaintiff seeks a temporary injunction prohibiting Spangler, or any person or entity acting by, through, or in concert with Spangler, including VMG, from:

(a)    soliciting or providing services for persons or entities who were clients of JTaylor as of Spangler's termination date or during the one-year period immediately preceding his termination date (including, but not limited to, CHRISTUS Health) and in which Spangler:
(i)    had personal contact or dealings on behalf of JTaylor;
(ii)   had knowledge of JTaylor's plans with respect to such client;
(iii)  had knowledge not available to the general public regarding such client; or
(iv)   had direct or indirect responsibility for delivery of services to such clients;

(b)    interfering with JTaylor's relationship with any clients that existed as of Spangler's termination date or for the one-year period immediately preceding his termination date (including any attempt to request or advise that any JTaylor clients withdraw, curtail, or cancel business with JTaylor); and

(c)    using Plaintiff's Confidential Information for any purpose, including to solicit business from or perform services for any client of JTaylor (including, but not limited to, CHRISTUS Health).

61.    The Level II Compensation Agreement that Spangler signed specifically permits JTaylor to obtain injunctive relief for the breach or threatened breach of the Restrictive Covenants:

Employee expressly agrees that a monetary remedy for any breach of the Restrictive Covenants would be inadequate and agrees that such a breach would cause the Company irreparable harm. Therefore, in the event of a breach or threatened breach by Employee of any of the provisions of the Restrictive Covenants, the Company, without waiving its right to any other form of relief, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages. (Level II Compensation Agreement at ¶ 7).

62. Even setting aside JTaylor's right to injunctive relief under the Level II Compensation Agreement, JTaylor satisfies the requirements for a temporary injunction under the law. *Placid Oil Co. v. U.S. Dep't of Interior*, 491 F. Supp. 895, 905 (N.D. Tex. 1980); *Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 U.S. Dist. LEXIS 57788 (N.D. Tex. Apr. 23, 2013). This requires a plaintiff to present a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011)); *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 685 (N.D. Tex. 2016).

63. Spangler waived the bond requirement in the Level II Compensation Agreement. (*See* Level II Compensation Agreement at ¶ 7). Nonetheless, JTaylor is willing to post a bond or deposit money into the registry of the Court in order to obtain the requested injunction.

64. Plaintiff further seeks a permanent injunction enjoining Spangler, or any person or entity acting by, through, or in concert with Spangler, including VMG, for a period of two years, from:

(a) soliciting or providing services for persons or entities who were clients of JTaylor as of Spangler's termination date or during the one-year period immediately preceding his termination date (including, but not limited to, CHRISTUS Health) and in which Spangler:
    (i) had personal contact or dealings on behalf of JTaylor;
    (ii) had knowledge of JTaylor's plans with respect to such client;
    (iii) had knowledge not available to the general public regarding such client; or
    (iv) had direct or indirect responsibility for delivery of services to such clients;

(b) interfering with JTaylor's relationship with any clients that existed as of Spangler's termination date or for the one-year period immediately preceding his termination date (including any attempt to request or advise that any JTaylor clients withdraw, curtail, or cancel business with JTaylor); and

  (c)  using Plaintiff's Confidential Information for any purpose, including to solicit business from or perform services for any client of JTaylor (including, but not limited to, CHRISTUS Health).

## V. CONDITIONS PRECEDENT

65. All conditions precedent to Plaintiff's claims have been performed, have occurred, or have been waived.

## VI. Prayer

Plaintiff respectfully prays that the Court grant a judgment against Defendants for each of the following:

1. Judgment upon the causes of action pled herein against Defendants;

2. Judgment against Defendants for all of the relief enumerated, whether generally or specifically, in this petition and prayer, including actual damages and specific performance;

3. An order tolling the Restrictive Covenants during the period in which Spangler was in violation of same;

4. A temporary injunction enjoining Defendants as described in Paragraphs 59-64;

5. A permanent injunction enjoining Defendant as described in Paragraphs 59-64;

6. Judgment against Defendants for Plaintiff's reasonable attorneys' fees and expenses;

7. Judgment against Defendants for all prejudgment and post judgment interest as provided by law;

8. Punitive damages and/or exemplary damages;

9. Judgment against Defendants for all costs of Court; and

10. For all other relief to which Plaintiff may be legally or equitably entitled.

Respectfully submitted,

**WINSTEAD PC**

By:   */s/ Stephen D. Taylor*
      Stephen D. Taylor
      State Bar No. 24056414
      staylor@winstead.com
      Anneke Cronje
      State Bar No. 24087357
      acronje@winstead.com
      300 Throckmorton Street, Suite 1700
      Fort Worth, Texas 76102
      Telephone No.: (817) 420.8200
      Facsimile No.: (817) 420-8201

***Attorneys for Plaintiff***